James LAWRENCE et al., Plaintiffs,

v.

UTILITY WORKERS UNION OF AMERICA, LOCAL UNION 126 et al., Defendants.

Civ. A. No. C80–1864A.

United States District Court, N. D. Ohio, E. D.

March 16, 1981.

Eugene Green, Youngstown, Ohio, for plaintiffs.

William B. Gore, Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

This case came on for trial on a labor dispute that was advanced and consolidated with an application for a preliminary injunction.[1]  See Fed.R.Civ.P. 65(a)(2).  A motion for a temporary restraining order was granted by the Court and has continued to remain in effect upon the mutual consent of the parties.  Plaintiffs, members of Utility Workers Union of America, AFL–CIO, Local Union 126 (Local 126), challenged the refusal to install James Lawrence as the duly elected president of Local 126.  Defendants[2] contend that John Braswell was the only one of two candidates for president on the official ballot who met the meeting-attendance eligibility requirement of Local 126 and thus won the

---

[1].  At the trial on the merits the only evidence adduced was in the form of exhibits.  No testimonial evidence was received.  Instead, the parties stipulated to the facts as presented in opening statements.  There was only one issue of material fact upon which the parties could not agree:  whether there was any meeting-attendance eligibility rule in effect for the election held by Local 126 on August 19, 1980.

[2].  The other defendants are Richard Zito, duly elected and acting vice president; Fred Metzler, duly elected and acting secretary; Geoffry Guthrie, duly elected and acting treasurer; and Local 126.

election. Plaintiffs claim that there was no meeting-attendance eligibility requirement effective on the date the election at issue was held. Alternatively, plaintiffs claim that any such eligibility requirement is invalid. Upon consideration and for the reasons stated below, the within action is dismissed for want of jurisdiction.

## I.

Article V, section 14, of the Constitution and By-Laws of Local 126, as approved by the National Union in 1977[3] sets for the following eligibility requirement for holding office:

> Any member of Local 126 in good standing, who has attended seven (7) regular meetings in the twelve (12) months prior to the month of nominations, shall be eligible for any office or delegate to any National Convention. Credit will be given when working second shift, vacation or overtime during the hours of the meeting, when the Office of the Secretary has been notified.

Pursuant to article VII, section 1, of the National Union's Constitution,[4] an amended eligibility rule was approved on August 21, 1980. Article VI, section 1c, of the revised Constitution and By-Laws of Local 126 provides as follows:

> Any member of Local 126 in good standing who has attended three (3) regular meetings in the twelve (12) months prior to the month of nominations, shall be eligible for any office or delegate to any National Convention. Credit will be given when working second shift, vacation or overtime during the hours of the meeting, *when the Office of the Secretary has been notified.*

The amended meeting-attendance eligibility rule thus deviated from its predecessor only insofar as the required attendance quota for the twelve months prior to the month of nomination was reduced from seven to three regular meetings.

In March, 1977, Local 126 submitted a request that the National Union comment on its former meeting-attendance eligibility rule. Under Article VII, section 1, of the National Constitution the local unions are required to adopt by-laws that are consistent with the provisions of the National Constitution. Although the National Union places no specific requirements upon candidates for office in the local union, article XV, section 8 of the National Constitution addresses the minimum eligibility qualifications for delegates to the National Convention.[5]

In a letter dated March 9, 1977, the National Union suggested that Local 126 hold its election of national delegates without imposing its meeting-attendance eligibility

---

**3.** Article VII, section 1, of the National Union's Constitution and By-Laws requires that approval for the Local Union's Constitution and By-Laws be obtained from the National Union.

Local Unions, Regional Boards or Joint Councils, may adopt such by-laws and rules as do not conflict with any of the provisions of this Constitution or the policies of the National Union. All local unions, regional boards or joint councils, shall send copies of their Constitution and By-Laws to the National President for approval before they shall take effect, and if not in conflict with the National Constitution, they shall be approved.

**4.** *See* note 3 *supra.*

**5.** Article XV, section 8, of the National Constitution provides as follows:

No member shall be eligible to be a delegate to a National Convention unless (a) he shall have been in continuous good standing for a period of twelve (12) months prior to the National Convention or (b) if his Local Union

has been in existence for less than twelve (12) months, prior to the National Convention, he must have been in continuous good standing for a period of four (4) months previous to the month in which the Convention is held, before he will be eligible to be a convention delegate; and is employed in a plant, shop, office or any other place within the jurisdiction of the National Union; or is one of the Staff Representatives of the National Union; or an Officer, Employee or Representative of a Local Union. The National Officers and the members of the National Executive Board shall be ex-officio delegates to all National Conventions and shall be seated at the Convention with all rights and privileges of delegates, but without vote, except that the National President shall have the right to vote in the event of a tie. They shall not be required to be elected delegates to be eligible for election to office.

rule. The National Union identified two related considerations in making its suggestion. First, it noted that the former eligibility rule did not violate the letter of the National Constitution. Nonetheless, it considered the provisions of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 to 531, as implicitly incorporated within the National Constitution. Second, noting that a meeting-attendance eligibility rule had recently been invalidated as violating Title IV of the LMRDA in *Steelworkers v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977), the National Union suggested that Local 126 forego imposing its attendance quota in order to avoid a potential conflict with federal labor law.

Understandably, the comments of the National Union focused primarily upon the application of the eligibility rule to the election of national delegates, as the National Constitution does not address requirements for elective office at the local union level. The commentary of the National Union did, however, conclude with the suggestion that Local 126 take steps to adopt for the election of both local union officers and national delegates an eligibility requirement that looked to a qualification other than attendance.

The letter was drafted solely in precatory language. In its most imperative terms, the letter merely cautioned that any election of delegates in which the attendance quota is imposed would not be in compliance with the LMRDA. Neither this letter nor any other action taken by the National Union can be construed as invalidating the former meeting-attendance eligibility rule. The former meeting-attendance eligibility rule remained in effect and was enforced in all elections for officers held by Local 126 with one exception. Under the provisions of a voluntary agreement and the procedures established at a pre-election conference the former rule was not applied in a special election held on May 30, 1979. The nomination and election proceedings were supervised in their entirety by the United States Department of Labor and the rule was suspended only for those proceedings.

The former meeting-attendance rule had never been invalidated, however, by any administrative or judicial action.

At a regularly scheduled meeting held on August 5, 1980, nominations for Local 126's upcoming election were conducted. An attempt was made to place in nomination for the office of president the name of James Lawrence. Lawrence had not, however, attended any meetings in the last twelve months and it was declared that he was therefore ineligible to receive the nomination.

On August 19, 1980, Local 126 held the election for the positions of president, secretary, trustee, board member at large, and secretary-at-arms. Local 126 maintained and established practice of write-in candidates for the office of president. Plaintiff Lawrence received 161 write-in votes for office of the president and incumbent, John Braswell, received 113 votes.

The effective date of the amended meeting-attendance eligibility rule was the date upon which it received the approval of the National Union: August 21, 1980. Since the election was held prior to the approval of the amended rule by the National Union, the former meeting-attendance eligibility rule was in effect for the election conducted on August 19, 1980. Local 126 refused to install Lawrence on the ground that he is ineligible to hold the office of president under either the former rule or the amended rule. There is no indication that either eligibility rule was discriminatorily applied to the write-in candidacy of Lawrence.

Lawrence has exhausted all available and reasonable internal union remedies in pursuing his claim that he is entitled to installation as the president of Local 126. Lawrence also filed a complaint with the United States Department of Labor. Upon investigating the charges filed by Lawrence, the Secretary of Labor found probable cause to believe that a violation of Title IV of the LMRDA had occurred in the election conducted on August 19, 1980, by Local 126. Subsequent to the filing of the instant suit, the Secretary of Labor brought an action

based upon its investigation and probable cause finding. *See Zuck v. Local 126, Utility Workers Union of America, AFL–CIO,* C81–180A (N.D.Ohio filed February 2, 1981).

During the course of the trial, defendants maintained that approval of the amended meeting-attendance rule by the National Union was not required and that the rule was thus effective as of the date it was adopted by Local 126. As was indicated in a letter over the signature of the National President, the amended rule was approved on August 21, 1980, pursuant to Article III, section 1, of the National Constitution. The issue of the effective date of the amended rule is immaterial to the merits of the instant case, however. Lawrence has failed to attend any regular meeting within the twelve preceding months and was therefore ineligible to hold office under either the former or the amended meeting-attendance eligibility rule. Moreover, a dispute concerning the uniform application of an eligibility rule allegedly enforced prior to its final adoption under union procedures is, within the posture of the instant action, outside the jurisdiction of this Court.

## II.

Plaintiffs' theory of recovery is predicated upon a claim for violations of section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1).[6] Plaintiffs allege that the majority of the electorate of Local 126 have been disenfranchised by the refusal to install Lawrence to the office of president. It is further alleged that the disenfranchisement was accomplished by the application of an eligibility rule that had not been validly adopted under union procedures.

Plaintiffs seek equitable relief and monetary compensation for their section 101(a)(1) claim, asserting that this Court has jurisdiction over the matter by virtue of section 102 of the LMRDA, 29 U.S.C. § 412, and section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.

## III.

The right of the nation's labor force to self-organize and to collectively assert its interest within a framework of unionization is firmly established by federal legislation. *See e. g.,* Labor Management Relations Act of 1947, 29 U.S.C. §§ 141 et seq. The growth of the union movement, however, was beset by a number of abuses. The enclave of exclusive bargaining power created by the federal labor laws harbored an ever present threat of union-official corruption. Many of these acts of corruption were inimical to the viability of democratic principles within union organization.[7] During the 1950s these problems were investigated by the congressional Committee on Improper Activities in the Labor and Management Field.

> Some trade unions have acquired bureaucratic tendencies and characteristics. The relationship of the leaders of such unions to their members has in some instances become impersonal and autocratic. In some cases men who have acquired positions of power and responsibility within unions have abused their power and forsaken their responsibilities to the membership and to the public. The power and control of the affairs of a trade union by leaders who abuse their power and forsake their responsibilities inevitably leads to the elimination of efficient, honest and democratic practices within such union, and often results in irresponsible actions which are detrimental to the public interest. H.R.Rep.No.741, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News 2424, 2428.

**6.** Reference is also made in the complaint to section 101(a)(2) and section 609 of the LMRDA. *See* 29 U.S.C. § 411(a)(2) and § 529. The claims for violations of these sections have not been pursued beyond citation in the complaint. Section 101(a)(2) guarantees the rank-in-file freedom of speech and assembly. Section 609 prohibits the disciplining of any union member for exercising any of the rights enumerated in the LMRDA. The complaint and the record before the Court are bereft of any allegation or suggestion that the within election dispute involves conduct that would trigger either of these substantive provisions. Their appearance in the complaint can be characterized only as a vestige of a shotgun pleading technique that fails to provide a legitimate basis for invoking federal jurisdiction.

**7.** The abuses of power were identified as follows:

Congress responded to the problems verified during the congressional investigation by enacting the LMRDA. *See* 29 U.S.C. § 401; S.Rep.No.187 & H.Rep.No.741, 86th Cong., 1st Sess., *reprinted in* [1959] U.S. Code Cong. & Ad.News 2318 & 2424. A major portion of the LMRDA is concerned with promoting the principles of democratic union governance, especially in the nomination and election of candidates for office. Full participation of the rank-in-file in the union electoral process and an organizational hierarchy that is responsive to the membership are the themes interwoven into both Title I and Title IV of the LMRDA. *See Wirtz v. Hotel, Motel & Club Employees Union Local 6*, 391 U.S. 492, 497, 88 S.Ct. 1743, 1746, 20 L.Ed.2d 763 (1968).

Although generally speaking both Title I and Title IV strive to promote traditional democratic principles in union elections, their respective substantive provisions address different aspects of the electoral process. Moreover, each title maintains a contradistinct set of enforcement provisions.

Through section 101(a)(1), Title I guarantees the rank-in-file "equal rights and privileges" to participate in the nomination and election of candidates for union office.[8] Section 102 is the enforcement provision for violations of Title I and opens the federal courts to private actions by aggrieved union members.[9]

Through section 401(e), Title IV guarantees that any member in good standing has the right to become a candidate for union office.[10] The enforcement provision for Title IV violations is codified in section 402. The union member whose Title IV rights have been violated must pursue administrative remedies which may ultimately result in the commencement of a civil action in federal court by the Secretary of Labor.[11] Prior to invoking the jurisdiction of the federal courts, section 402 requires an exhaustion of internal union remedies,[12] filing a complaint with the Secretary of Labor,[13]

---

**8.** Section 101(a)(1) provides:

Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws.

29 U.S.C. § 411(a)(1).

**9.** Section 102 provides:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

29 U.S.C. § 412.

**10.** Section 401(e) provides in relevant part:

In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization of any member thereof. . . .

29 U.S.C. § 481(e).

**11.** Section 402(b) provides:

The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.

29 U.S.C. § 482(b).

**12.** 29 U.S.C. § 482(a)(1).

**13.** 29 U.S.C. § 482(a)(2).

and a finding of probable cause by the Secretary that a violation of Title IV has occurred.[14]

The distinctions between Title I and Title IV violations are subtle and the line between their substantive provisions is often elusive. Challenged conduct that ostensibly violates both titles further obfuscates the task of determining the appropriate remedial procedure. There is also a problem of timing. Section 403 of the LMRDA suggests that the remedial procedures outlined in Title IV constitute the exclusive remedy for post-election claims. *See Dunlop v. Bachowski*, 421 U.S. 560, 566, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975) (hereinafter referred to as *Bachowski*).[15]

### A.

In *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) (hereinafter referred to as *Calhoon*), union members attempted to invoke the jurisdiction of the federal courts to attack an eligibility rule for elective office and to enjoin any further elections until the rule was revised. The claimants commenced the private civil action alleging that the rule violated section 101(a)(1), and sought to invoke federal jurisdiction under section 102. Jurisdiction under this section can be properly invoked only for an alleged violation of section 101. Thus, whether the federal courts had jurisdiction to resolve the dispute over the eligibility rule required an analysis of the scope of section 101(a)(1) and the essence of the charges contained in the complaint. *See* 379 U.S. at 138, 85 S.Ct. at 295.

In resolving this issue the Supreme Court sought to articulate the distinction between the substantive rights codified in Title I and Title IV. Section 101(a)(1) is concerned with the equal rights and privileges to nominate and to vote, and not with the rules governing the eligibility of candidates. "Whether the eligibility requirements set by the union's constitution and bylaws were reasonable and valid is a question separate and distinct from whether the right to nominate on an equal basis given by § 101(a)(1) was violated." 379 U.S. at 139, 85 S.Ct. at 295.

In *Calhoon* the Court concluded disputes concerning the eligibility of candidates for office "fall squarely within Title IV of the Act and are to be resolved by the administrative and judicial procedures set out in that title." 379 U.S. at 141, 85 S.Ct. at 296. Thus, the challenge to the eligibility rule brought by the union members was dismissed for want of jurisdiction.

This interpretation rested upon the Court's perception of the wherewithal of the Secretary of Labor to determine the reasonableness and validity of such union rules, and the reluctance to interpose the federal courts in the union electoral process with any greater frequency than is necessary: [16]

---

**14.** *See* note 11 *supra.*

**15.** Section 403 provides:

No labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitution or by-laws, except as otherwise provided by this subchapter. Existing rights and remedies to enforce the constitution and by-laws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter. The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.

29 U.S.C. § 483 (emphasis added). *See* note 18 *infra.*

**16.** The combination of administrative and judicial remedies under Title IV is subject to criticism for being too lengthy and often inadequate to redress violations of that Title. *See e. g. Kupau v. Yamamoto*, 622 F.2d 449, 454–55 (9th Cir. 1980). Whether a cause of action is brought in federal court depends upon whether the Secretary finds probable cause that a violation has occurred. *See* 29 U.S.C. § 482(b). Title IV remedies "are inherently time consuming, that the aggrieved union member has no control over the litigation once the complaint is filed by the Secretary, and that immediate redress is impossible since the winner of the election remains in office pending resolution of the Title IV proceedings." *Kupau, supra* at 455 (citations omitted).

To mitigate the injustice that may arise from these concerns and to accomplish the goal of free and democratic union elections the aggrieved union member may intervene in the Secretary's suit, *see Trbovich v. United Mine*

It is apparent that Congress decided to utilize the special knowledge and discretion of the Secretary of Labor in order best to serve the public interest .... Reliance on the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts.

379 U.S. at 140, 85 S.Ct. at 296 (citation omitted). *See also Wirtz v. Local 153, Glass Bottle Blowers Association of the United States and Canada, AFL–CIO,* 389 U.S. 463, 470–74, 88 S.Ct. 643, 647–49, 19 L.Ed.2d 705 (1968).

The holding in *Calhoon* is not difficult to state: allegations of a discriminatory or uneven application of an eligibility rule constitute a Title I claim, while allegations challenging the reasonableness or validity of an eligibility rule support only a claim under Title IV. The distinction between Title I and Title IV claims, however, becomes less clear in the actual context of disputed union nominations and elections.

For example, in *McGuire v. Grand International Division of the Brotherhood of Locomotive Engineers,* 426 F.2d 504 (6th Cir. 1970) (hereinafter referred to as *McGuire*), a member of the union sought to challenge in district court an election held by the international union. The basis of the claim was that the national delegate failed to place the member's name in nomination as instructed. The national delegate's inaction apparently violated the constitution and by-laws of the local union.

The Sixth Circuit in *McGuire*, relying upon the *Calhoon* case, held that the union member's complaint "although claiming a violation of Title I rights, in substance alleges a nomination procedure which violated the rights protected under Title IV." 426 F.2d at 507. Thus, the district court's

*Workers of America,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), or receive judicial review of the Secretary's refusal to commence

decision dismissing the action on jurisdictional grounds was affirmed.

The Sixth Circuit stated two grounds in support of its decision to affirm the district court. First, it is the substance of the claim that must be viewed as controlling and not how the claim is framed in the complaint. There must be an allegation of discrimination that independently supports a Title I claim. "If an individual member could bring suit by the simple expedient of framing a claim under Title I, where the substance of the claim falls under Title IV, the comprehensive administrative and procedural provisions of Title IV would be rendered meaningless." 426 F.2d at 508. A claim that the nomination and election procedures challenged violate the constitution and by-laws of the union constitutes a Title IV matter. *Id.* at 508 n.4.

Second, the Sixth Circuit turned to the timing of the complainant's suit. Relying upon sections 402 and 403, the Court held that "[w]here post-election relief is sought under Title IV the exclusive remedy is provided by that title. Only the Secretary may bring suit." 426 F.2d at 508. *See also Bachowski, supra,* 421 U.S. at 566, 95 S.Ct. at 1857; *McDonough v. Local 825, International Union of Operating Engineers,* 470 F.2d 261 (3rd Cir. 1972) (hereinafter referred to as *McDonough*). In light of the congressional policy against unnecessary judicial interference into internal union affairs, for the purposes of section 403 a reasonable construction is that "an election has been conducted once balloting has occurred." *McDonough, supra* at 264 (citation omitted).

**B.**

▇ Lawrence claims that the application of the eligibility rule to his write-in candidacy for president of Local 126 and the refusal to install him to that office has disenfranchised a majority of the union's electorate and thus violates section 101(a)(1). Assuming the veracity of his

suit. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

claim there is no allegation that the eligibility rule was applied in an uneven or discriminatory fashion. Merely relying upon the expediency of framing a Title I claim will not suffice to invoke this Court's jurisdiction. Conspicuously absent from the complaint and record before the Court is any indication that the rule was not evenly applied to all prospective nominees for office and write-in candidates. Nor is there any allegation that the eligibility rule was discriminatorily applied with the intent to exclude Lawrence.[17]

Furthermore, Lawrence was declared ineligible to run for office during the nominations conducted on August 5, 1980. Those who voted for Lawrence as a write-in candidate at the elections held on August 19, 1980, were not misled as to Lawrence's ineligibility to hold office. This portion of the electorate was not disenfranchised but chose to cast part of their ballots for an ineligible candidate.

Lawrence also claims that there was no valid eligibility rule in effect for the election at issue because the requisite approval was not given by the National Union until two days after the voting was concluded. It would appear that if this were the case that the former, more stringent rule was effective. It cannot be seriously contended that for the disputed election there were absolutely no qualifications applicable to prospective candidates for office. Lawrence was unable to meet either of the meeting-attendance requirements contained in the former and latter eligibility rules.

As is the case for challenges to the reasonableness of such rules, a claim that the rule was not validly adopted under the union's procedures is a Title IV matter. *See McGuire, supra* at 508 n.4. Thus, the alleged application of the latter eligibility rule prior to its final approval under internal union procedures will not support a Title I claim.

The essence of the within dispute is an attack upon the reasonableness and validity of an eligibility rule applied to a union election. Uneven or discriminatory application of an eligibility rule is not at issue here, and exactly which rule was actually applied is unimportant. "In the absence of a claim of discrimination by the union against the union member, a federal district court lacks jurisdiction to award relief for an alleged violation of [section 101(a)(1)]." *Kupau v. Yamamoto*, 622 F.2d 449, 453 (9th Cir. 1980) (hereinafter referred to as *Kupau*). *See Trail v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 542 F.2d 961, 966 (6th Cir. 1976) (hereinafter referred to as *Trail*).

Thus, "the gravamen of this complaint plainly falls within Title IV." *McGuire, supra* at 508 (footnote omitted). Here the complaint must be construed as an attempt to seek post-election relief under Title IV. The exclusive remedy provided under Title IV requires that only the Secretary of Labor commence such an action. *Id.*

### C.

Plaintiffs forcefully argue that more recent case law suggests that the scope of Title I should not be cut off by the existence of a concurrent Title IV claim or the fact that the claim is asserted through a post-election action. *See Kupau, supra; Bunz v. Moving Picture Machine Operators Protective Union Local 224*, 567 F.2d 1117 (D.C.Cir.1977) (hereinafter referred to as *Bunz*). Initially it is important to note that this Court has not reached its decision on the jurisdictional issue because of the existence of a concurrent Title IV claim or the timing of the within action.

In *Kupau* a union member was allowed to run for office, but after he received a majority of the votes the union declared that he was ineligible to hold office and refused

17. It is asserted only through plaintiffs' post-trial reply brief that the eligibility rule was applied solely to exclude Lawrence from the ballot. This allegation appears nowhere in the complaint and is not supported by the competent proofs adduced at trial. Tailoring an argument against the grain of the factual posture of the dispute cannot support a legitimate basis for invoking jurisdiction under Title I.

to install him. Plaintiff Kupau claimed a violation of Title I, alleging that the union had discriminatorily applied the eligibility rule to deprive him of office, and commenced a private action in federal court. The determination of ineligibility was made subsequent to the balloting and departed from customary practice. The Secretary of Labor commenced suit under Title IV, upon an administrative claim filed by the incumbent, charging that Kupau's installation would violate that title.

The Ninth Circuit construed the allegation of an inconsistent and uneven application of the eligibility rule as stating a claim under Title I. The *Kupau* Court held that a concurrent Title IV claim will not preempt the Title I relief to which plaintiff may be entitled:

> Total preemption of Title I Relief by Title IV in the area of elections is belied by the legislative history of the LMRDA. Title IV had been drafted, discussed, and approved before Title I was even proposed. Congress added Title I at least partly in response to fears that Title IV was not strong enough to effectuate the central purpose of the LMRDA, the preservation of union democracy.

622 F.2d at 455 (citation omitted).

Also, the *Kupau* Court held that Title I jurisdiction was appropriate notwithstanding the timing of the claim. Where the Title I claim does not ripen until after the election is conducted, the *Kupau* Court held that section 403 does not bar a post-election Title I remedy. 622 F.2d at 456–57. In reaching this determination, the Ninth Circuit refused to read literally the *dicta* in *Bachowski, supra* 421 U.S. at 566, 95 S.Ct. at 1857, that Title I concerns only pre-election conduct.[18]

In *Bunz* a union conducted a referendum on a picket assessment in violation of its own rules. After the referendum was conducted the union issued a patently frivolous

interpretation of its constitution raising the percentage of votes required to defeat the assessment and altering the final result. The D.C. Circuit Court held that a union cannot circumvent section 101(a)(1) by affording merely an illusory right to vote and thus allowed the union member to pursue his Title I remedies; the right to vote guarantees of Title I implicate a right to cast a meaningful vote. *See also Sertic v. Cuyahoga, Lake, Geauga and Ashtabula Carpenters District Counsel of United Brotherhood of Carpenters and Joiners of America,* 423 F.2d 515, 521 (6th Cir. 1970); *Blanchard v. Johnson,* 388 F.2d 208, 213–14 (N.D.Ohio 1975), *aff'd in relevant part,* 532 F.2d 1074 (6th Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976).

Turning to the circumstances of the instant case, the *Kupau* and *Bunz* cases are inapposite. This case does not present an overlap between available remedies because there is no uneven or discriminatory application of an election rule to support a Title I claim. The allegations and facts presented in the instant case amount to no more than a possible Title IV violation, and therefore there is no need to decide whether concurrent remedies may be pursued.

Similarly, the absence of a Title I claim makes it unnecessary to decide whether a post-election challenge can be brought under that title's remedial provisions. It is also important to note that the inability to cast a meaningful vote and to challenge the election rules prior to the balloting weighed heavily in the decisions rendered in *Kupau* and *Bunz* to allow post-election suits. The ineligibility of Lawrence to hold office, however, was made known well in advance of the election. Nonetheless, no attempt was made to test the reasonableness, validity or application of the rule prior to the election.

---

18. In *Bachowski* the Supreme Court intimated that the temporal frame within which the challenged conduct occurred is important:

> Certain LMRDA provisions concerning pre-election conduct, 29 U.S.C. §§ 411–413 and 481(c), are enforceable in suits brought by individual union members. Provisions concerning the conduct itself, however, may be enforced only according to the post-election procedures specified in 29 U.S.C. § 482.

421 U.S. at 566, 95 S.Ct. at 1857.

Nor can it be said in this case that the electorate of Local 126 were denied the opportunity to cast a meaningful vote. No one was misled as to the status of Lawrence's eligibility to hold office. It should have been no surprise to anyone that Lawrence would not be installed to office even though he received as a write-in candidate a majority of the votes cast.

## IV

■ Plaintiffs also assert that section 301 of the LMRA[19] provides a jurisdictional basis upon which this Court may reach the merits of the instant labor dispute. Plaintiffs' theory is that defendants have breached the constitution and by-laws of Local 126, specifically Article V, sections 4 and 5,[20] which is a contract between labor organizations within the ambit of section 301. Assuming arguendo that defendants' refusal to install Lawrence is a breach of Local 126's constitution and by-laws, this novel theory of jurisdiction is without solid legal support.

The Court recognizes that section 301 has been broadly construed to provide a federal cause of action by union members against their international union for breach of contractual rights established under the charter and by-laws. *See e. g., Abrams v. Carrier Corp.*, 434 F.2d 1234 (2d Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). The Sixth Circuit has specifically declined to follow this approach in the context of union referendums and elections. In *Trail* the Sixth Circuit held that section 301 will not extend federal jurisdiction over a claim that a referendum was held in violation of the union's constitution and by-laws. 542 F.2d 967–68.

The *Trail* Court relied upon two reasons in support of its decision. First, there is the general congressional and judicial reluctance "to authorize judicial intervention in the internal affairs of unions." *Id.* at 968. Second, there are other "specific and complete remedies" for such claims. *Id.*

This rationale compels a similar result in the instant case. Here plaintiffs' cause of action focuses upon an internal union dispute over the results of an election. The union electoral process is the subject of much of the LMRDA. To construe section 301 as bestowing federal jurisdiction in this case would serve only to collapse the distinct remedial procedures established by Congress for enforcing the rights guaranteed under Title I and Title IV of the LMRDA.

## V

Accordingly, the Court having found for the foregoing reasons that it is without jurisdiction under either section 102 of the LMRDA or section 301 of the LMRA to resolve the within labor dispute, the above captioned case is hereby dismissed without prejudice to the parties to pursue their statutory remedies under Title IV of the LMRDA.

IT IS SO ORDERED.

19. Section 301(a) provides:
   Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
   29 U.S.C. § 185(a).

20. Section 4 provides that the candidate receiving the highest number of votes shall be declared elected. Section 5 provides that officers elected shall assume office at the regular September meeting.